THE AGUA PURA COMPANY OF LAS VEGAS,
Appellee, v. THE MAYOR AND BOARD OF
ALDERMEN OF THE CITY OF LAS VEGAS, Ap-
pellants.

1.  CODE PLEADING—COUNTERCLAIM. Under the code, an affirmative
    defense in a suit, formally denominated equitable, should be made
    in the form of a counterclaim, and not in that of a cross-bill.

2.  ID. Under the old equity practice, a cross-bill had to be germane
    to the original bill; that is, it could not bring in new issues which
    would constitute the subject of an independent suit, but it could
    only bring in matters touching the very matters in question in the
    original bill. Under the code, the counterclaim is limited to: (1)
    A cause of action arising out of the contract or transaction set

forth in the complaint as the foundation of the plaintiff's claim or connected with the subject of the action; (2) In an action arising on contracts, any other cause of action arising also on contract and existing at the commencement of the action. The purpose of this action was to prevent interference with plaintiff's business by the enforcement of a penal ordinance. The contract set out in the petition was pleaded merely by way of inducement, and no relief was asked under it. It was not proper, therefore, for defendants in a counterclaim to seek to have said contract forfeited and set aside.

3. COUNTIES—MUNICIPAL CORPORATIONS—POWERS OF COUNTY COMMISSIONERS.—Prior to 1884, cities were not incorporated in New Mexico under general laws; they existed only under special acts of the Legislature. County commissioners had the power "to represent the county and have the care of county property and the management of the interests of the county in all cases where no other provision is made by law," and "to make all contracts and do all other acts in reference to the property and concerns necessary to the exercise of its corporate or administrative powers." Providing an adequate supply of water for municipal and domestic purposes in one of the communities of the county possessed of no other municipal government than that afforded by the county, was a matter pertaining to the interest of the county and was a legitimate county purpose. The contract entered into between the plaintiff and the board of county commissioners of the county of San Miguel, for the purpose of providing an adequate supply of water for municipal and domestic purposes to Las Vegas, an unincorporated community located in said county, was a valid and legal contract.

4. CITIES—WATER RATES—PRIOR CONTRACTS. The Act of March 18, 1897, authorizing any city or town organized and existing under the laws of the Territory of New Mexico to regulate by resolution or ordinance, the prices to be charged for water to such city or town, contained the proviso that said act should not affect any contract then existing. By reason of said proviso said act can not and does not affect the contract between plaintiff and the board of county commissioners of the county of San Miguel.

5. ID. CONSTITUTIONAL LAW. The Legislature has power, if exercised directly by it, to fix water rates for municipal or private purposes, provided the rates so fixed be reasonable; but it can not delegate such power to a municipal corporation or other subordinate authority except under provisions which will insure its exercise in a reasonable manner, and those provisions must in some manner afford to the parties, whose rights are to be affected, the protection of judicial interposition and determination. The Act of

March 18, 1897, delegated the power of the Legislature in the behalf mentioned, to the cities and towns of New Mexico; the city of Las Vegas, proceeding under said act, was an interested party in the matter of water rates, and to the extent of the water used for municipal purposes, fixed rates for itself; the act contained no provision for the determination by the courts of the reasonableness of the rates fixed by the cities and towns; such an act is in itself an unreasonable exercise of the power to regulate, is unconstitutional and void. (Cleveland Gas Co. v. Cleveland, 71 Fed. Rep. 614, approved.)

*Appeal* from District Court of San Miguel County. Affirmed.

The facts will appear in the opinion of the court.

WILLIAM B. BUNKER, ELISHA V. LONG, WM. G. HAYDON AND VEEDER & VEEDER for appellants.

FRANK SPRINGER AND ANDRIEUS A. JONES for appellee.

PARKER, J.—This is an appeal from the judgment of the district court of the Fourth judicial district, granting and making perpetual an injunction against appellants, restraining the enforcement of certain ordinances passed by them. The case was heard and determined below upon bill, answer and cross-bill, and demurrers thereto, and from the allegations and admissions in the pleadings it appears that the facts of the case are as follows:

The Agua Pura Company, plaintiff below and appellee in this court, was duly incorporated under the laws of the Territory of New Mexico in the year 1880, for the objects and purposes among other things: the storage of water in lakes, reservoirs, and the digging of wells in the county of San Miguel, and the sale, distribution and disposition of water in said county, for the purposes of irrigation, manufacturing and for domestic, fire service, municipal, economic and industrial purposes generally. That said company, under its articles of incorporation, was authorized to sue and be sued, to hold real and personal property, and to carry on the business of supplying, distributing and selling water

through mains and pipes. That shortly after its incorporation, to wit: on December 20, 1880, a contract was made between the said Agua Pura Company and the board of county commissioners of the county of San Miguel, containing the following provisions:

"That from and after the twentieth day of December, A. D. one thousand eight hundred and eighty, until the full and complete expiration of fifty years, the said, the Agua Pura Company shall have and is hereby granted 'the. privilege and right to lay water main and pipe near to and along the course of the Gallinas, a distance of six miles from its northern limits to the town of Las Vegas, if necessary to procure a sufficient supply of pure water, to erect, maintain and operate all buildings, machinery and other works which are or may become necessary for the purposes contemplated in their organization, to wit:

"For the purpose of storage of water in lakes, reservoirs and the digging of wells in the county of San Miguel. The sale, distribution and disposition of water in said county for the purpose of irrigation, manufacturing and for domestic, fire service, municipal, economic and industrial purposes generally. The sale, disposition, granting, leasing and transfer of water rights and water privileges. The cutting, storage, sale, distribution and disposition of ice. For the purchase and acquiring of real estate, machinery and other property, real, personal or mixed. For the business and purposes aforesaid and for the operation and running of the machinery connected therewith. To levy, charge, collect rents for any of the privileges herein acquired and generally to do and perform all other things necessary or requisite to carry into effect the purposes and objects aforesaid, and as are provided by law, within the limits of the town of Las Vegas, and its suburbs, county and territory aforesaid, to lay water mains, and pipes under and along any and all the streets of said town and its suburbs for the purpose of distributing water throughout said town and its suburbs, and to sell said water to all persons, bodies,

corporations, societies and firms desiring to purchase and use the same. That the said company shall have and it is hereby granted the privilege and license to sell and dispose of, as it may deem fit, the water, ice, etc., as above described, and generally, that the said company shall have all the rights and privileges (including the right to buy, hold, sell and convey such real estate as is necessary for the prosecution of their business) subject to the restrictions of these articles, and the said order, necessary for the proper and successful prosecution of their business as above described, in the town of Las Vegas and its suburbs, county of San Miguel, and Territory of New Mexico.

"And for and in consideration of the premises and the foregoing promises, covenants and agreements entered into on the part of the said board of county commissioners, the said Agua Pura Company, party of the second part, does hereby promise, covenant and agree to and with the said board of county commissioners, party of the first part, as follows, to wit:

"That the said company will not charge the said town of Las Vegas, nor any person, body, corporation, society or firm, more than the rates usually charged and paid in other cities in the United States, under like conditions and circumstances, for water and like and similar facilities, for construction, operation and sale.

"That within six months from the date hereof the said company will commence actual operations within said town of Las Vegas for the construction of the necessary works, for the purpose of providing a water supply; that on or before the thirty-first day of October, A. D. 1881, the said company will have at least one mile or more of distributing water main or pipe laid in the said town of Las Vegas or its suburbs, ready for use from the point or place from whence said water supply is distributed, and will be ready to furnish water along the line of said mains and pipes to the town of Las Vegas and to all persons, bodies, corporations, firms or societies desiring to purchase and use the

same; that within a reasonable time thereafter the said company will lay pipe, distribute and sell water on any and all the streets respectively of said town of Las Vegas so far as there may be any reasonable demand for such water on said streets or any of them.

"And that the said company will at all times furnish a full and sufficient supply of good water and pure, as the natural sources from which it must be drawn will permit, to meet the reasonable demands of said town and its suburbs and of the citizens thereof, on the conditions herein stated, unless prevented temporarily by unavoidable accidents, or causes beyond their control."

That under said contract the plaintiff proceeded to and did construct, for the purposes in said contract mentioned, a system of water works, including dams, reservoirs, a main pipe line from a point about six miles north of the town of Las Vegas to and into said town, and also distributing mains and pipes throughout what was then the town of Las Vegas, and its suburbs in the county of San Miguel aforesaid, and has since then, from time to time, made additions to said plant. That plaintiff has ever since the time fixed by said contract continuously maintained and operated said water plant, and is now so operating the same; and that in the process of such construction and operation it has laid and maintained its mains and pipes near to and along the course of the Gallinas river, and under and along the streets of said town of Las Vegas and its suburbs. That since the year 1881, plaintiff has continuously engaged in and carried on the sale, distribution and disposition of water supplied by and through its pipes and mains in the said town of Las Vegas and its suburbs, for the domestic, municipal and other purposes in said contract specified; that plaintiff has sold such water for such charges as it saw fit; that plaintiff has adopted and fixed a schedule of the rents and prices charged for the water so supplied by it; that said contract with the board of county commissioners was made before the municipal corporation, now known as the city of Las

Vegas was organized or incorporated, and at a time when all of the territory now embraced in said city and in the then town of Las Vegas and its suburbs was under the municipal control of the said board of county commissioners of San Miguel county, there being no town or city government within any part of such territory. That long subsequent to the making of said contract and the construction by plaintiff of its dams, reservoirs, main pipe line and principal distributing pipes, a portion of the territory which at the date of said contract was known as the town of Las Vegas, was incorporated into a town under the name and style of the town of East Las Vegas, and that afterwards the said town of East Las Vegas was erected into the city of East Las Vegas, and that afterwards the name of the said city was changed to the city of Las Vegas. That ever since the year 1881, plaintiff has been supplying water for fire service and other municipal purposes for the territory formerly embraced in the town of Las Vegas and its suburbs, under a contract therefor with the said board of county commissioners, and ever since the organization of said town and city of East Las Vegas it has been supplying water for additional fire service to said town and city under a contract with the trustees and proper municipal authorities of said town and city. That on June 17, 1897, the defendants, constituting the city council of the city of Las Vegas, claiming to act under and by virtue of the power conferred by an act of the Thirty-second Legislative Assembly of the Territory of New Mexico, approved March 18, 1897, entitled "An act to enable cities and towns to regulate the prices of gas, electric lights, and water, furnished to either cities or towns or the inhabitants thereof," passed a resolution adopting a schedule of rates for water to be supplied to said city and the inhabitants thereof by any firm or corporation; that the rates fixed by such schedule, as to the items thereof in most general use, were greatly reduced below those charged by plaintiff; that such schedule of rates was adopted by defendants without notice to plain-

tiff. That on June 29, 1897, the said city council of Las Vegas, passed an ordinance in relation to water rates and fixing penalties, which is as follows:

## "ORDINANCE NO. 86.

"An ordinance of the city of Las Vegas, relating to water rates and charges, and fixing penalties for excessive charges for water, and penalties for unlawfully shutting off water.

*"Be it ordained by the City Council of the City of Las Vegas*:

"Section 1. If any corporation, person, individual or water company shall charge, or demand payment of any citizen of the city of Las Vegas, for water or for any supply or use of water; any sum in excess of the rate fixed by the common council of the city of Las Vegas, for such water, or such use thereof or supply thereof, such person making such charge or demand, or any individual or water company or corporation, making such charge or demand, shall be deemed guilty of violating the provisions of this ordinance, and shall for every such charge, or demand, be liable to be fined on conviction thereof the sum of not less than $10 or more than $300, or imprisoned for not more than three months, in the discretion of the court in which such conviction is had.

"Sec. 2. If any agent, or employee of any corporation, person, individual, or water company, shall demand of any citizen of the city of Las Vegas, or of any property owner, or water consumer, of such city, or shall take or receive from any such citizen, property owner, or water consumer, any sum of money for water, or for any supply or use of water, within such city, any sum in excess of the rate or rates fixed by the common council of the city of Las Vegas, such agent or employee, or person so taking or receiving such sum of money, shall be deemed guilty of a violation of this ordinance, and on conviction thereof shall be liable to be

fined in any sum not less than ten, or more than one hundred dollars, in the discretion of the court in which such conviction shall be had.

"Sec. 3. If any corporation, water consumer, person or individual, or any agent or employee of such corporation, water company, person or individual, shall, after any citizen or property holder, or water consumer of the city of Las Vegas shall have tendered to such water company, corporation, person, individual or agent, or employee of such water company, corporation, person or individual, the price fixed by the common council of the city of Las Vegas for water, or for the supply or use thereof, within the said city of Las Vegas, turn off or stop such water, in that event, the corporation, water company, person or individual, employee or agent of such corporation, water company, person or individual so doing shall be subject, on conviction thereof, to a fine of not less than $10 or more than $300, or imprisonment not to exceed sixty days, in the discretion of the court in which such conviction may be had.

"Sec. 4. Any citizen of Las Vegas, property holder or water-consumer, shall have the right to tender to any corporation, water company or to the agent or employee of any such corporation, water company, or person, supplying water or the use thereof within the city of Las Vegas, the price fixed by the city council of the city of Las Vegas, for such water or the use thereof, and the right to demand, on such tender, that the water and the use thereof for which the amount so tendered would pay, at the rate fixed by said city council, be supplied to the person making such demand and tender; and in all cases where such tender is made it shall be the duty of the corporation, water company, agent or employee to whom such tender is made, to supply the water for which such tender is made, and on failure or refusal so to do, the corporation, water company, person or agent or employee so failing, shall, on conviction, be liable to be fined in the sum of not less than ten dollars nor more than three hundred dollars.

"Sec. 5.   This ordinance shall be in force from and after five days after its publication."

That on July 2, 1897, public notice was given by defendants that printed forms and the services of counsel would be furnished by the city of Las Vegas, free of charge, to the citizens, to prosecute complaints made by private parties of violation of the foregoing ordinance.

Thereupon, on July 13, 1897, plaintiff filed its bill of complaint for an injunction, restraining defendants from enforcing the said resolution or ordinance. After a hearing of both parties, a temporary injunction was granted. Afterward, by leave of court, plaintiff amended its bill, and defendants interposed a demurrer to the amended bill, which was overruled. Defendants then answered the bill, and also filed a cross-bill and counterclaim. The answer denied the validity of the contract of December 20, 1880, as well as its legal effect as claimed by plaintiff; denied that the acts done by plaintiff were done under or by virtue of any power possessed by it under its articles of incorporation, the said contract, or any lawful authority; alleged that plaintiff's charges for water were not reasonable; that plaintiff had not complied with the terms and provisions of said contract either as to the quality of quantity of water; that the rates charged by plaintiff for water are excessive and exorbitant; that the rates fixed by the defendants are not less than the rates charged in other cities of the United States under like conditions and circumstances with the city of Las Vegas and its suburbs. The cross-bill and counterclaim, after reciting averments, prayers and purposes of the bill, set out the contract of December 20, 1880, and then with somewhat greater elaboration set out in substance the same allegations as contained in the answer, charging failure on the part of plaintiff to comply with the terms and provisions of said contract, its failure to supply water of the quality or in the quantity provided for in said contract; that plaintiff had charged rates for water which are excessive and exorbitant, and that the rates fixed by the city council are reasonable and

not less than the rates charged in other cities of the United States under like conditions and circumstances; and prayed in the first part of said cross-bill and counterclaim that the said contract be decreed to be of no force and effect, and that the same be by decree of the court annulled, set aside and vacated, and that the cross-defendant, the Agua Pura Company, have no right to compel the enforcement of said contract or to compel the payment of water rates, heretofore fixed, established and charged by it, and that the said corporation have no exclusive right to the use of the streets and alleys of the city of Las Vegas for the purpose of furnishing water to said city or its inhabitants; and in the second part of said cross-bill and counterclaim prayed for a decree requiring the said cross-defendant, so long as it should continue to maintain its water system and furnish water under said contract, to furnish to the city of Las Vegas and its suburbs and the inhabitants thereof, a full and sufficient supply of good, pure and wholesome water, free from mud, filth and other impurities, and to enlarge its water mains and pipes to a capacity sufficient to furnish at all times an ample supply of water for the uses and purposes in said contract stated, and to construct and maintain sufficient and proper water reservoirs, filters and settlers, and to reduce its water rates to correspond in amount with the rates charged by other cities situated similar to Las Vegas, and that it be enjoined from enforcing its present water rates by turning off water from consumers willing to pay reasonable rates, and that it be required to permit the municipal authorities, at reasonable times, to examine the books of said corporation to ascertain therefrom the value of its water system, the cost of operation, and the revenue derived therefrom, and generally in all respects complained of in the cross-bill that said corporation be compelled on its part to fully perform the said contract.

Plaintiff filed a demurrer to the answer and to the cross-bill and counterclaim on the following grounds:

"1.   That the said answer does not state facts sufficient to constitute a cause of defense to the plaintiff's complaint.

"2.   That the said counterclaim does not state facts sufficient to constitute a cause of action by way of counterclaim against the plaintiff in this suit.

"3.   That the said counterclaim does not state any cause of action arising out of transactions set forth in the complaint as the foundation of plaintiff's claim, or connected with the subject of the action.

"4.   That the matters set forth in said counterclaim and the relief therein sought against plaintiff are not germane to the matters set forth in the original bill of complaint."

Upon the hearing, the demurrer to the answer and cross-bill and counterclaim, was sustained; defendants and cross-plaintiffs refused further to answer or plead, and the court rendered judgment making the injunction perpetual.   From this judgment, defendants appeal to this court.   Full argument was heard at the last term and elaborate briefs were filed on both sides, to all of which the court has given the attentive consideration which the importance of the question demands.

In order to simplify the statement of the conclusion which we have reached, we will first consider the question of pleading raised by the cross-bill or counterclaim.   This paper contains two distinct cross-bills, with separate averments and different prayers for relief.   Both set out the contract of 1880.   The first seeks to have the contract forfeited for breach of conditions by plaintiff.   The second prays for a decree requiring the contract to be specifically performed by plaintiff. As this pleading was filed after the code of civil procedure went into effect, we think it should have been in the form of a counterclaim, simply, and that a cross-bill of the form heretofore known in equity pleadings is no longer a

CODE pleading—
counterclaim.

proper pleading. From the title given it seems probable that counsel were in doubt—since the action was begun before the code took effect—whether they should proceed under the old or new practice. Waiving the matter of form, however, we think the same principles apply to it whether treated as a cross-bill or counterclaim. It is well settled in equity practice that a cross-bill must be germane to the original bill; that is, it must be brought touching the very matters in question in the original bill, and must not bring in new issues which would constitute the subject of an independent suit. And a counterclaim under the code is limited to: First. A cause of action arising out of the contract or transaction set forth in the complaint as the foundation of the plaintiff's claim, or connected with the subject of the action. Second. In an action arising on contract, any other cause of action arising also on contract and existing at the commencement of the action.

ID.

The manifest object of the action instituted by the plaintiff, and the only relief sought, was to prevent interference with its business by the enforcement of a penal ordinance. It was not suing upon the contract of 1880, or asking any relief under it. True, it set out the contract as evidence of its right to carry on the business in which it was engaged, but it sought no relief founded upon it. The chief object of pleading it, as we gather from the whole record, was to show that, having a contract, plaintiff was protected from the operation of the statute authorizing the council to fix rates, by the express words of the statute itself. It might be that by reason of some act or omission on plaintiff's part, the contract ought to be declared forfeited for breach of condition, or the water company ought to be required by decree to perform some act which it has left unperformed, but these were judicial questions which had not been raised at the time the action of the city council was taken; they were determinable only upon the proofs after

due hearing; such relief as asked in the cross-bill might eventually, after such hearing, be granted, or it might be refused for want of sufficient grounds. But it must be clear that, pending the determination of such a controversy, the plaintiff should not remain subject to criminal prosecutions for exercising rights for which it might ultimately be held to be fully entitled. In other words, granting the existence and validity of the contract, the plaintiff was entitled to carry on its business under it without interference by a penal ordinance until it should be declared forfeited in a judicial proceeding brought for that purpose; and hence, would be entitled to relief by injunction irrespective of any such question. As to whether the plaintiff had any rights at all under the contract, that question would fully arise under the allegations of the answer. We think, therefore, that the demurrer to the cross-bill and counterclaim was properly sustained.

The substantial contention in this case arises over the right of the city council to fix the rates at which water shall be sold for municipal and private purposes, and to compel the acceptance of such rates by parties selling the water, under penalty of fine or imprisonment. The power to do this is claimed by the city council under an act of the Legislative Assembly of the Territory of New Mexico, approved March 18, 1897, found in chapter 57 of the Laws of 1897, page 124, which reads as follows:

"That any city or town, organized and existing under and by virtue of the laws of the Territory of New Mexico, shall have, and is hereby vested with the power to regulate, by resolution or ordinance, the prices to be charged by any individual, firm, co-partnership, or corporation, for gas, electric lights, and water furnished by the said individual, firm, co-partnership or corporation to such cities or towns of this Territory or any of the inhabitants, resident therein: Provided, that this shall not affect any contract now existing."

The plaintiff sets up the contract of December 20, 1880, and claims that by reason of the existence of such contract it is excepted from the operation of the foregoing act of the Legislature by the express terms of the proviso, which declares that the act "shall not affect any contract now existing." This leads at once to the inquiry whether there was a contract, and if so, what rights did the water company have under it which might be affected by the operation of the said law. The contract of December 20, 1880, between the board of county commissioners of San Miguel county and the Agua Pura Company, seems to be plain enough on its face. If it was and is a valid and subsisting contract, there can be no doubt that under it the Agua Pura Company had and still possesses the absolute and vested rights, during the term of such contract, to lay water mains and pipe near to and along the course of the Gallinas river, a distance of six miles from the northern limits of the town of Las Vegas, if necessary to procure a sufficient supply of pure water; to erect, maintain and operate works which are or may become necessary for the purpose of the sale, distribution and disposition of water in San Miguel county, New Mexico, for the purpose of irrigation, manufacturing and for domestic, fire service, municipal, economic and industrial purposes generally; to lay water mains and pipes under and along any and all the streets within the territory which at the date of said contract was known as the town of Las Vegas and its suburbs, in the county and Territory aforesaid, for the purpose of distributing water throughout said town and its suburbs; to sell said water to all persons, bodies, corporations, societies and firms desiring to purchase and use the same, and to sell and dispose of the water, ice, etc., as it may deem fit. These rights and privileges necessarily, *ex vi terminorum,* include the right of the company to fix the price at which it will sell the water and other things it deals in as it may deem fit to those who desire and are willing to purchase them. No one would be obliged to buy from it at the price charged by the company, nor would

it be obliged to sell to any one at a price different from that charged by it. This would be purely a matter of agreement between the parties, the same as a purchase and sale of any other commodity between other parties. Any act of the Legislature, giving power to the city or town to regulate the prices to be charged to the city or to the inhabitants thereof, for water furnished by the water company by means of the plant established under said contract, would necessarily affect such contract, by taking away one of the most important rights granted by it. It is necessary, therefore, to inquire whether the contract of December 20, 1880, was, at the commencement of this action, a valid and subsisting contract. Counsel for appellants contend that the contract was void *ab initio* for want of power in the county commissioners to make it.

It is undoubtedly true, as counsel for appellants insist, that municipal corporations, such as counties and cities, are limited in their powers to those which are granted expressly or by necessary implication. The power to act must be derived from the law conferring it. We must, therefore, look to the statutes of the Territory to ascertain what were the powers of counties at the time this contract was made. By the act of 1876, chapter 1, the organized counties in the Territory of New Mexico were made bodies corporate and politic, and their powers vested in boards of county commissioners who were empowered: "To represent the county and have the care of the county property, and the management of the interests of the county in all cases where no other provision is made by law." Comp. Laws 1897, sec. 664, par. 5.

COUNTIES—municipal corporations — powers of county commissioners.

Among the powers given to the counties as bodies corporate and politic, were: "To make all contracts and do all other acts in reference to the property and concerns necessary to the exercise of its corporate or administrative powers." Comp. Laws 1897, sec. 651, par. 4.

These clauses seem to mean something more than the

ordinary powers appertaining to counties. They confer express authority to do the acts in the interest of the county, and to make contracts in reference to the concerns necessary to the exercise of this authority, when not otherwise provided by law. We do not understand that the grant of powers to counties or other municipal corporations must contain a specification of each particular act to be done, but it is sufficient if the words used be sufficiently comprehensive to include the proposed acts. An express authority may be general as well as particular. It is clear that the powers of the counties, by the foregoing act, are recognized as being not only "corporate" but "administrative." There was a reason for this. At the date of the passage of these sections, and up to as late as 1884, there was in New Mexico no general law for the incorporation of cities or towns, in which powers of local administration are usually vested. Prior to 1884 all cities were incorporated under special acts of the Legislature, and in 1876 there were only three of these in the Territory. Las Vegas was not one of these, either then or in 1880. Hence, in order that communities should not be without municipal government of some kind, these administrative powers were conferred upon the county boards in such express and general terms as to leave their exercise to the discretion of the boards of commissioners in the management of the interests of the county, and the concerns necessary to the exercise of these powers. We think it beyond question that the providing of an adequate supply of water for municipal and domestic purposes, in one of the communities of the county, was a matter pertaining to the interest of the county, and was a legitimate county purpose. If, as held by the Supreme Court of the United States in Folsom v. Ninety-six, 159 U. S. 628, the building of railroads was a county purpose, a *fortiori* must an enterprise for supplying its towns and inhabitants with water be a county purpose, especially when the county in its administrative capacity, is the only municipal authority having control of the territory concerned in the matter. We think,

therefore, that such a contract as the one in question was within the power of the board of county commissioners at the time it was made. We do not undertake to review and discuss the authorities cited by counsel for appellants in opposition to the power of the county commissioners, for the reason that if there should be any doubt as to the validity of the contract as originally made, by reason of defective power in the county commissioners, all such doubt would be removed by subsequent legislation on the subject.

By an act of the Legislature of New Mexico, approved February 23, 1893, it was provided as follows:

"Section 1. Be it enacted that section 1865 of title 33, chapter 2 of the Laws of New Mexico, 1884, be amended by adding thereto the following words: And no action or suit shall be brought to call in question any privilege or franchise granted by any municipal corporation unless the same shall be brought within six years after the same shall have been granted, or claimed to have been granted, and any such privilege or franchise heretofore granted by any municipal corporation shall, after six years from the date of the granting of the same, or within six years after the same shall have been claimed to have been granted, shall be deemed valid in all respects: Provided, however, that suits may be brought to vacate or annul any such privilege or franchise within six months after the passage of this act."

The effect of this act was two fold: It was first a limitation upon actions to call in question any privilege and franchise granted by any municipal corporation; and second, it made absolutely valid all privileges or franchises of this nature after six years from the date of the granting of the same, unless suit was brought to vacate or annul the same within six months after the passage of the act. It appears by the record that at the time when the action of the city council was taken, the Agua Pura Company had been operating under the contract in question for sixteen years, and during that time had been continuously supplying water to the county and to the town and city of Las Vegas under

several contracts, and to the inhabitants thereof. No action had been taken in the meantime to annul or call in question the said contract, nor was any suit for that purpose brought within six months after the passage of the act above quoted. The contract, is, therefore, by express terms of the foregoing act, now valid in all respects, and it can not now be called in question by answer, cross-bill or otherwise. This being the case, it necessarily follows, that the city council has no power, under the act of 1897, to regulate rates so as to affect or interfere wth the rights of the Agua Pura Company under the contract of December 20, 1880, and that the attempt of the city council to do so, as complained of in this case, is such an interference with those rights as entitles plaintiff to relief by injunction.

Much has been said, both in the oral argument of counsel for appellants and in their briefs, as to the necessity of plaintiffs showing a compliance with the agreements made by it in said contract, before it can be entitled to relief against the city ordinances. This argument is founded upon a misconception of the action. It is not, as appellants contend, a suit for specific performance of the contract. As we have said before, the complaint seeks for no relief under the contract. It simply asks that the contract, as it exists, shall not be interfered with. For this purpose, allegations of performance of plaintiff's agreement are not necessary in this action. The contract, being valid, either originally or by subsequent legislative ratification, remains valid until annulled by some judicial proceeding, and until this is done it is a complete protection to plaintiff against any act attempted to be done under the Law of 1897. The answer to plaintiff's complaint contains a number of allegations charging that the water company has failed to perform the obligations assumed by it in the contract of 1880, and it is contended with much earnestness by appellants that these allegations, being admitted by the demurrer, operate to preclude relief to plaintiff. The question is not, however, whether these allegations are true, but whether they consti-

tute a defense in the present case.   The demurrer only admits such facts as are well pleaded.  If the facts thus alleged do not constitute in law a good defense, then they are not admitted by the demurrer.   If the facts charged in the answer were true, they would certainly have constituted ground for an original action against the water company to compel a specific performance of its contract.   In a proper proceeding, these facts would be the subject of a very material inquiry.   The contract of 1880 contains certain agreements and covenants on the part of the Agua Pura Company, to wit: that it would not charge the town of Las Vegas, nor any person, corporation, etc., more than the rates usually charged and paid in other cities in the United States under like conditions and circumstances, for water and like and similar facilities, for construction, operation and sale; that it would commence operations within a certain time, and within a reasonable time thereafter would lay pipe, distribute and sell water on any and all the streets, respectively, of said town of Las Vegas, so far as there may be any reasonable demand for water on said streets or any of them; and that it would at all times furnish a full and sufficient supply of good water and pure, as the natural sources from which it must be drawn will permit, to meet the reasonable demands of said town and its suburbs, and of the citizens thereof, on the conditions herein stated, unless prevented temporarily by unavoidable accidents or causes beyond its control.

These are positive and absolute obligations on the part of the Agua Pura Company which it is bound to perform, and which the courts will compel it to perform.   In holding that the contract was valid and subsisting at the time of the commencement of this action, so as to be a protection to plaintiff against the operation of the act of 1897, we do not wish to be understood as holding that the water company is thereby relieved of any of its obligations under said contract.   On the contrary, it holds the contract subject to all the burdens with which it was originally made or accepted.

If the water company has failed of performance of these obligations in any particular, it is now and would have been perfectly competent for the board of county commissioners to bring a suit to compel such performance; and if in such suit, after a judicial investigation, the court should find that any of such agreements or covenants had not been complied with by the Agua Pura Company, a decree would be rendered requiring due performance thereof within a reasonable time, under penalty of a forfeiture of the contract, or such other penalty as the court should then consider proper. But it does not follow that by failure to perform some or all of its undertakings, the contract is *ipso facto* absolutely forfeited and cancelled. The contract does not so provide, and such would not be the legal effect of such failure. Some direct proceeding for that purpose must first be brought and adjudicated before it can have that effect. When the action of the city council was taken, no such proceedings had ever been instituted, although the water company had been operating under its contract for sixteen years. Such action was void, as against plaintiff, because, among other things, being an interference with a contract, it came within the exception expressly made by the act itself. It would remain void until the contract should be annulled by some competent judicial authority. The action of the city council being void, the plaintiff was entitled to immediate relief by injunction against such action, and it is no defense to allege a state of facts upon which the contract might have been, but had not yet been, attacked.

Even if there were no contract to bring the case within the proviso of the act of 1897, the question would still remain whether it is within the power of the Legislature to authorize the city to fix the price at which water and other commodities mentioned in the act, shall be sold, by an *ex parte* proceeding such as was attempted in this case. The power of the Legislature to regulate rates of charges for services of a public or quasi-

CITIES — water rates — prior contracts.

public nature, including the supply of water, when the same will not interfere with rights that have become fixed and vested by contract, is now established by the decisions of both the State and Federal courts. It is upon wise and salutary grounds of public policy that those who exercise franchises of a quasi-public nature should be under a wholesome and reasonable restraint as to the charges they may exact for their services. Examples of the necessity of some such restraining power will readily suggest themselves to the mind of everyone. But this power is subject to one qualification, and that is, that it must be exercised either by the Legislature itself, directly, or if delegated to any subordinate authority it must be under provisions which will insure its exercise in a reasonable manner, and with some provision by which the rights of parties to be affected may have the protection of judicial determination. The limitations upon this power have been clearly defined and laid down by the Supreme Court of the United States in the case of the Chicago Railway Company v. Minnesota, 134 U. S. 418, which arose under an act of the Minnesota Legislature creating a railroad commission and authorizing it to regulate freight rates. The commissioners had fixed rates for certain freight, and the Supreme Court of Minnesota held that the action of the commission was conclusive. The Supreme Court of the United States reversed this decision of the State court, and in considering the validity of such manner of regulating rates, said:

"This being a construction of the statute by which we are bound in considering the present case, we are of the opinion that, so construed, it conflicts with the Constitution of the United States in the particular complained of by the railroad company. It deprives the company of its right to a judicial investigation, by due process of law, under the forms and with the machinery provided by the wisdom of successive ages, for the investigation judicially of the truth of a matter in controversy, and substitutes therefor, as an absolute finality, the action of a railroad commission

which, in view of the powers conceded to it by the said court can not be regarded as clothed with judicial functions or possessing the machinery of a court of justice.

"No hearing is provided for, no summons or notice to the company before the commission has found what it is to find and declared what it is to declare, no opportunity provided for the company to introduce witnesses before the commission, in fact, nothing which has the semblance of due process of law; and although, in the present case, it appears that, prior to the decision of the commission, the company appeared before it by its agent, and the commission investigated the rates charged by the company for transporting milk, yet it does not appear what the character of the investigation was or how the result was arrived at.

"The question of the reasonableness of the rate of charge for transportation by a railroad company, involving, as it does, the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination.

"If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it thus is deprived while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

It is contended by appellants that the decision in this case was contrary to the doctrine laid down by the Supreme Court in the case of Munn v. Illinois, 94 U. S. 113, and has been modified or overruled by the case of Budd v. New York, 143 U. S. 517, in which the doctrine of the Munn case was reaffirmed. But an examination of these cases shows that such is not the effect of the decision in the Budd

case.  In the Munn case it was held that the power to regulate elevator charges was a legislative one, and could be exercised directly by the Legislature.  In Railway v. Minnesota, it was held that this power could not be delegated to a subordinate authority, such as a commission, to be exercised without some provision for judicial determination of the reasonableness of the charges.  The Supreme Court itself, in its opinion in the Budd case, clearly points out this distinction.  After referring to what was decided in 134 U. S., as we have above quoted it, the court says (p. 546):

"That was a very different case from the one under the statute of New York, in question here, for in this instance the rate of charges is fixed directly by the Legislature.  * * What was said in the opinion in 134 U. S., as to the reasonableness of the charge being one for judicial investigation, had no reference to a case where the rates are prescribed directly by the Legislature."

And even as to this power, the court refers to the previous case of Dow v. Beidelman, 125 U. S. 680, as recognizing, upon the authority of the Munn case and similar cases, the doctrine that:

"The Legislature may itself fix a maximum and beyond which any charge would be unreasonable, in respect to services rendered in a public employment, or for the use of property in which the public has an interest, subject to the proviso that such power of limitation or regulation is not without limit, and is not a power to destroy or a power to compel the doing of the service without reward, or to take private property for public use without just compensation or without due process of law."

If the method of regulating rates by a commission, provided for in the Minnesota case, is invalid, because without due process of law, for how much stronger reason must an act be invalid which undertakes to delegate the legislative power, not to an impartial commission, but to one of the parties in interest?  It is one of the oldest maxims of the law that no one can be judge in his own case.  Here, not only

is the city council the direct representative of the inhabitants
of the community, the supply of whom constitutes the
greater part of the business of this and similar companies,
but as to the supply of water for municipal purposes it is
itself a consumer, and is the actual and direct party in in-
terest with which the water company is obliged to contract.
To say that the party which is itself the purchaser, should
have the absolute power to fix the price at which the owner
of a commodity shall sell it to him, would be to state a propo-
sition that no member of the community would for a mo-
ment admit, if applied to his own business. It is not to be
supposed, judging from the known rules of human conduct,
that a regulation of price by the purchaser himself would be
fair or reasonable; and a delegation of such power by the
Legislature to one of the interested parties, without any
provisions for judicial review or determination as to the
reasonableness of such action, is in itself an unreasonable
exercise of the power to regulate, such as renders the act
invalid. Among the numerous cases involving this question
of regulation in various forms, which have been arising un-
der the State and Federal courts, we have been referred to
none, nor are we aware of any such, in which a delegation
by the Legislature of power to regulate rates in matters
of this and similar nature to a subordinate authority, which
was itself interested as a purchaser or consumer, has been
upheld. On the contrary, it has been vigorously condemned
in at least one case in the United States courts. In the
United States Circuit Court for the northern district of
Ohio, Judge Jackson held a similar act of the Ohio Legis-
lature to be unconstitutional. In discussing this question
he said:

"The question that now faces the court is whether a mu-
nicipal corporation, itself a consumer of gas, as alleged in

the bill, in its corporate relation to the company, to the extent of $5,000 or $6,000 per month, can, under the legislative sanction conferred by section 2478 of the Revised Statutes of Ohio, fix, or has the constitutional right to fix, the terms or price at which itself and all other consumers shall pay for the gas furnished. It would be a fearful proposition—monstrously absurd and outrageous—if the Legislature were to undertake to confer upon a citizen of Cleveland the right to say at what price services should be rendered to him, or what he should pay for goods and articles furnished him. There is hardly any law in this land that would make the party being furnished, the judge of the price that he should pay, or would say that his arbitrary decision should fix the rights of the parties. The city of Cleveland has undertaken to do that thing under this section, No. 2478, as disclosed by the bill." Cleveland Gas Co. v. Cleveland, 71 Fed. Rep. 614.

*Id: constitutional law.*

The language used by Justice Jackson applies in all its force to the act now under consideration, and the action of the city council under it. Without questioning the power of the Legislature itself, by direct act, to regulate rates in cases not covered by previous contracts or vested rights, we hold that the Legislature can not constitutionally delegate such power, to the authorities of a city which is itself a consumer, either in its municipal capacity or through its inhabitants, without any provision for a judicial investigation of the reasonableness of the rates fixed by such authorities; and that the action of the city council in this case, attempting to fix rates, and to enforce their acceptance by a penal ordinance, was, therefore, unauthorized and void, whether there was a valid contract or not.

It follows from the foregoing considerations that the judgment of the district court must be affirmed with costs, and it is so ordered.

Mills, C. J., Crumpacker and McFie, J. J., concur.