**ALLSTATE LEASING CORPORATION,**
**Plaintiff-Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS, RIO ARRIBA COUNTY, NEW MEXICO, Defendant-Appellant.**

**ALLSTATE LEASING CORPORATION,**
**Plaintiff-Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS, SANTA FE COUNTY, NEW MEXICO, Defendant-Appellant.**
**Nos. 490-70, 491-70.**

United States Court of Appeals, Tenth Circuit.
Nov. 1, 1971.

date on the bill of sale and that the delivery date were different." [punctuation sic]

5. *See* note 4 *supra.*

Charles D. Olmsted, Santa Fe, N. M. (Victor R. Ortega, Dist. Atty., First Judicial District, State of New Mexico, with him on the brief), for appellants.

Robert G. McCorkle, Albuquerque, N. M. (Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., on the brief), for appellee.

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

SETH, Circuit Judge.

In August 1966, Allstate Leasing Corporation, a California corporation, and the County Commissioners of Rio Arriba County, New Mexico, executed an agreement whereby the county leased a motor grader from Allstate for a term of thirty-four months. In September 1965, the County Commissioners of Santa Fe County, New Mexico, had also "leased" a piece of heavy equipment from Allstate under an identical agreement with the rental term in this case being sixty months. Both counties rented the equipment for work on county roads. Upon executing the contract with Rio Arriba County, Allstate purchased a motor grader for $22,150.00 and delivered the same to Rio Arriba County. Rio Arriba County used the grader about eight and a half months, then refused to make further payments. Allstate then repossessed the grader and sold it for $3,600.00. Similarly, upon entering into the contract with Santa Fe County, Allstate purchased a Diesel loader for $19,996.00 and delivered it to Santa Fe County. Santa Fe County used the machine about six and a half months and then refused further payment on the contract. Allstate repossessed the loader and sold it for $1,100.00. It is stipulated that the defendant counties did not ask for bids in the acquisition of such equipment, and that the provisions of the New Mexico Public Purchases Act were not complied with by defendants. It is further stipulated that the leases and schedules were not submitted for approval of the qualified electors of the counties involved.

Allstate sued the defendant counties in the United States District Court for the District of New Mexico, setting up diversity of citizenship and a claim for damages. The District Court ruled in favor of Allstate, holding in each case the defendant county liable on its contract. From these judgments, the counties appealed. Because of the similarity of the two causes, they have been consolidated on appeal.

The appellant counties raise three basic arguments:

First: New Mexico law, which empowers a county "to *purchase* and hold real and personal property," must be strictly construed and when so construed these leasing agreements are void and unenforceable.

Second: Even if New Mexico does permit counties to lease equipment, as distinct from purchasing it, any such agreement must comply with the New Mexico Public Purchases Act as it then existed (section 6–5–1, N.M.S.A.1953), which required the solicitation of bids. Since no such compliance was obtained here, the contracts in both cases are therefore void.

Third: The leases created debts and the counties thereby violated Article IX, section 10 of the New Mexico Constitu-

tion prohibiting the creation of such an obligation, and are void.

■ The first issue presented by appellants is whether or not the law of New Mexico permits counties to lease the equipment with which we are here concerned. A county in New Mexico is the creation of the state and derives all of its powers therefrom. Dow v. Irwin, 21 N.M. 576, 157 P. 490 (1916). Section 15–36–1, N.M.S.A.1953, sets out the general powers of New Mexico counties. This law states in part:

"Each organized county in this state shall be a body corporate and politic, and as such shall be empowered for the following purposes:

\* \* \* \* \* \*

"Second. To purchase and hold real and personal property for the use of the county.

\* \* \* \* \* \*

"Fourth. To make all contracts and do all other acts in reference to the property and concerns necessary to the exercise of its corporate or administrative powers. \* \* \* "

Appellants contend that this statute confers upon the counties the right to purchase personal property, but not the right to lease it. Appellee argues that the right to purchase is a broader power, and includes the right to lease.

The precursor of section 15–36–1, N.M.S.A.1953, was Ch. 151 of the Laws of 1876, which was the first territorial law purporting to outline the powers given to the counties by the Legislature and was interpreted in Agua Pura Co. v. Mayor, 10 N.M. 6, 60 P. 208 (1900), a case relied upon heavily by Allstate. In the cited case the defendant company had a contract with the county of San Miguel executed in 1880 to supply the city of Las Vegas with water and ice. In 1897 the territorial legislature passed a law which gave cities power to regulate water rates unless a preexisting contract was in existence, in which event regulation was not permitted. The city of Las Vegas enacted an ordinance regulating the plaintiff's rates. Plaintiff sought an injunction, arguing that its 1880 contract was a "contract" contemplated by the statute. Defendant argued it never had power to make this contract in the first place and the contract was void because the enabling legislation of 1876 (the ancestor of section 15–36–1, N.M. S.A.1953) empowered boards of county commissioners "to make all contracts and do all other acts in reference to the property and concerns necessary to the exercise of its corporate and administrative powers." Also the commissioners had "the care of county property and the management of the interests of the county."

The Agua Pura case is particularly significant on the question of whether a function or act of a county is within the statutory limitations placed on the county governing bodies. The basic issue in the case was whether the contract relative to city water was a county purpose. The court found that it was, and upheld the contract. The manner in which the purpose was to be achieved was not directly in issue as in the case before us. The Agua Pura case however does demonstrate how broadly the state court was prepared to read the antecedents of the statutory provisions here concerned. Issues similar to those in Agua Pura have subsequently arisen and have been disposed of on its authority. City of Las Cruces v. Rio Grande Gas Co., 78 N.M. 350, 431 P.2d 492; Mountain States Tel. & Tel. Co. v. Town of Belen, 56 N.M. 415, 244 P.2d 1112.

The appellants give great weight to Fancher v. Board of Comm'rs of Grant County, 28 N.M. 179, 210 P. 237 (1922). The case concerned the question as to how strictly a county in New Mexico must be held to follow statutory provisions directing the counties to perform certain functions or to accomplish certain ends. The state court required the county to closely follow the statutory directions, and thus adopted the doctrine that if a method or procedure is indicated it must be adhered to closely. This was reiterated in Bibo v. Town of Cubero Land Grant, 65 N.M. 103, 332 P.2d

1020, and in City of Clovis v. Crain, 68 N.M. 10, 357 P.2d 667.

■ The issue before us concerns more the question of whether a certain procedure is in fact prescribed by statute, and particularly the scope of the authority given to purchase. In resolving this, some guidance is found in the cases considered above, and we conclude, as did the trial court, that under these state decisions the county had the power to lease the road equipment as a power included in the right to purchase. The statutes relative to other governmental subdivisions do expressly refer to leases, but this is not persuasive here.

■ The second issue raised by appellants concerns the applicability of the New Mexico Purchases Act, section 6–5-1, N.M.S.A.1953, which requires bidding if a "purchase" exceeds a certain dollar amount. The trial court ruled against the appellants and cited an opinion of the New Mexico Attorney General on this point. The act in force at the time this contract was signed which referred only to purchases was changed in 1967 to expressly include leases. It is not necessary to discuss this point at length, and it is sufficient to say that we agree with the conclusion reached by the trial court on this point which was that the Purchases Act as it then existed was not applicable.

As has been indicated above, the contracts between the parties provided for a term of thirty-four months in the Rio Arriba County case and sixty months in the Santa Fe County case with specified rental payments due semi-annually. The contracts also set forth the "Total Rental Payable for Term of Lease" after which was a blank in which the dollar amount was inserted. Among the remedies of the lessor provided in the contracts was a right in case of default to sell the equipment, and in such an event the contract provided that there shall be due from the lessee the difference between the sale price" * * * and the total unpaid rental provided to be paid herein, plus all costs etc." This action

arose from Allstate's decision to pursue such a course. The contracts also provided that Allstate could bring an action to recover all rents " * * * then accrued or thereafter accruing as same shall accrue * * *" The contracts did not expressly provide that there was a lump sum due for the entire term payable in periodic installments. The contracts provided that title would not pass to the lessee, and no option to purchase was included.

Appellants contend that the contracts in question are invalid because they violate Article IX, section 10 of the New Mexico Constitution, which prohibits the counties from "borrowing money" except to erect, remodel, or make additions to necessary public buildings, or to construct or repair public roads or bridges. In these limited areas where borrowing is permitted, the Constitution provides that "such debt" must be submitted to the qualified electors and approved by a majority of them. Under the decision of the New Mexico Supreme Court in Seward v. Bowers, 37 N.M. 385, 24 P.2d 253, a "debt" in the constitutional sense is an unconditional obligation. The court there said a debt is " * * * an obligation [which] has arisen out of a contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard to any future contingency." In other sections of Article IX of the Constitution, reference is made to cities and the state incurring "debts," "borrowing money," and to "contract any debt." In State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.M. 312, 46 P.2d 1097, the New Mexico court characterized the several references as debt limitations. Thus the question is whether a "debt" was created by the contracts in issue, that is, whether there was an unconditional obligation to pay. Seward v. Bowers, supra. The appellants place much reliance on Shoup Voting Machine Corp. v. Board of County Comm'rs, 57 N.M. 196, 256 P.2d 1068. There the

county contracted to purchase voting machines from Shoup and to pay the purchase price over a period of ten years. The court held this to be a contraction of a debt by the county, and since it was not for buildings or roads it was unconstitutional. The Shoup case, however, in dealing as it does with a purchase-sale contract, is not directly in point. An agreement to purchase burdens the county with an unconditional obligation, whereas decisions from other jurisdictions have held that a lease agreement does not. See 71 A.L.R. 1318, and 145 A.L.R. 1362. Appellants also urge the similarity of the Arizona case of City of Phoenix v. Phoenix Civic Auditorium & Convention Center Ass'n, Inc., 99 Ariz. 270, 408 P.2d 818 (1965). As in the case at bar, the issue in Phoenix was whether the city was obligated at once for the entire aggregate of rentals it bound itself to pay to defendant over a period of several years. The agreement was for a lease of land by the city and a lease back to the city of a building to be built on it. As in most other variations of lease-back arrangements the court found the device to be no more than an attempt to avoid the state constitutional prohibitions.

In City of Los Angeles v. Offner, 19 Cal.2d 483, 122 P.2d 14 (1942), the court said:

> "It has been held generally in the numerous cases that have come before this court involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision."

Most courts have based their willingness to view lease agreements as not involving an unconditional obligation on the common law rule that did not recognize future rents as present debts or liabilities. See Clayton v. Kervick, 52 N.J. 138, 244 A.2d 281 (1968). It might be reasoned that these cases are distinguishable from the instant case because they involve the rental of real property with the possibility of eviction or because they involve service contracts where one of the parties might become incapacitated. In the case before us the equipment contract is not subject to these possibilities. However, in Ruane v. City of San Diego, 267 Cal.App.2d 548, 73 Cal.Rptr. 316 (1968), an analogous situation was litigated and the court ruled that no debt had been incurred by the city. In Ruane the city contracted to lease busses from a non-profit corporation set up for this very purpose. The court said:

> "City's monetary obligation under the lease was to pay $2,206,000 concurrently with execution of the lease, as prepaid rental, and the further sum of $360,000 on every January 15th and July 15th during the term of the lease, which was for a period from July 1, 1967, to May 31, 1972. There is no acceleration clause. Upon default the maximum obligation of City remains the same, i. e., to pay the designated semi-annual payments. The semi-annual rental is not payable until the due date. No indebtedness or liability therefor arises until that date. The consideration for each rental payment is the right to possess and use the leased property during the subsequent six month period."

The court thus upheld the validity of the contract, even though the city was to be given title at the end of the contract term.

█ The leasing of chattels by a municipality has thus been held to be a "contingent" obligation, and as such not a "debt." This is accomplished by a somewhat slavish adherence to the aforementioned common law rule regarding future rents and present debts. Contra, see People ex rel. Adamowski v. Public Building Comm'n of Chicago, 11

Ill.2d 125, 142 N.E.2d 67 (1957). The validity of a reliance on the common law rule may be open to question in its application to the problems raised in cases of this nature, but it must be recognized that a substantial body of authority exists which reaches the result that was here reached by the trial court. There are no New Mexico cases which concern what the parties here call "straight leases," and the pertinent constitutional provisions. Under these circumstances and although independently we might not have reached the same result, the trial court's determination that the New Mexico courts would decide that no debt was created, if faced with the issue, is accepted by this court as it cannot be said to be clearly erroneous.

Affirmed.